UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHIRLEY DANZIG,

    Plaintiff,

v.

BIO-CARE, INC. and RON PREW,
individually and personally,

    Defendants.
                               /

CASE NO. 1:09-CV-507

HON. ROBERT J. JONKER

## **OPINION**

Plaintiff Shirley Danzig brings two counts against her former employer, Bio-Care, Inc., and its president and part owner, Ron Prew, individually. Count One alleges willful violations of the wage and overtime provisions of the FLSA, 29 U.S.C. § 201 *et seq.*, and Count Two alleges state law claims of employment discrimination based on age.[1] (Compl., docket # 1.) Defendants moves for summary judgment on all claims, and Ms. Danzig moves for partial summary judgment on her claim that Defendants willfully violated the FLSA. (docket ## 30, 33.) The Court heard oral argument on the motions on July 27, 2010 (docket # 43). The Court has thoroughly reviewed the record and carefully considered the applicable law. The motions are ready for decision.

**Factual and Procedural Background**

*Bio-Care hires Ms. Danzig*

---

[1] The text of Count Two also recites a claim of disability discrimination, but Plaintiff's counsel confirmed at oral argument on the summary judgment motions that Plaintiff's theory of employment discrimination is based on age. Any potential disability theory has been abandoned.

Bio-Care is a private occupational health and medical testing company. (Prew Decl. at ¶ 2.)[2] Four business partners, including Mr. Prew, formed Bio-Care in 1993. (Prew dep. at 10-11.)[3] Bio-care performs health and safety monitoring, including physical examinations, tests, and screening for clients. (Prew Decl. at ¶ 3.) Bio-Care also offers hearing services designed to ensure that its clients' employees meet the hearing standards OSHA and MIOSHA establish. (*Id.*) It conducts much of the testing, including hearing testing, at customer locations using specially-equipped mobile testing vehicles. (*Id.*) Bio-Care is a small company, with six to eight employees. (Prew dep. at 13.) In recent years, its revenues have ranged from approximately $1 million to $1.75 million. (*Id.*)

In late 1999 or early 2000, after approximately twenty years managing the front office of a medical practice, Ms. Danzig began working for a company called Health Coach as a traveling medical assistant. (Danzig dep. at 20.)[4] Her work for Health Coach included performing a variety of medical tests, such as x-rays, EKGs, blood draws, drug testing, and hearing testing. (*Id.*) Health Coach worked primarily for manufacturing businesses. (*Id.*)

In 2003, Bio-Care formed a new company, Matrix Holdings ("Matrix"), to purchase Health Coach.[5] (Prew dep. at 24-26.) Following the purchase, Ms. Danzig became an employee of Matrix. (*Id.* at 33-34.) She was approximately 55 years old at the time. (*See* Compl., docket # 1, at ¶ 13.)

---

[2]Mr. Prew's declaration appears as Ex. B. to Defs.' Br. in Support of Mot. for Summ. J., docket # 31.

[3]Mr. Prew's deposition appears as Ex. A to Defs.' Br. in Support of Mot. for Summ. J., docket # 31, and Ex. B to Pl.'s Resp. to Defs.' Mot. for Summ. J. and Cross Mot. for Partial Summ. J., docket # 34.

[4]Ms. Danzig's deposition appears as Ex. A to Pl.'s Resp. to Defs.' Mot. for Summ. J. and Cross Mot. for Partial Summ. J., docket # 34, and as Ex. D to Defs.' Br. in Support of Mot. for Summ. J., docket # 31.

[5]It appears that Matrix and Bio-Care were closely related. Ms. Danzig's supervisors did not change when she shifted employment from Matrix to Bio-Care, nor did her responsibilities change. Matrix is not a party in this action, nor is it clear from the record whether Matrix still exists.

When Ms. Danzig's employment with Matrix began, she was paid on an hourly basis. (Danzig dep. at 128.) In 2005, Ms. Danzig and Mr. Prew agreed to change her pay arrangement from hourly to salaried. (*Id.* at 130.) Ms. Danzig explained the reason for the change: "I had a lot of overtime in previous years at certain times and at other times there was no work. . . . And it just wasn't feasible for me not to get paid when there was no work and [Mr. Prew] didn't like paying a lot of overtime, so we worked it out that I would be salaried." (*Id.*) Ms. Danzig understood that being salaried meant she would not receive overtime pay. (*Id.* at 131.) In 2007, Ms. Danzig formally became an employee of Bio-Care. (Prew dep. at 34.) According to Defendants, Ms. Danzig became a Bio-Care employee to have access to the medical insurance benefits Bio-Care offered. (Prew declaration at ¶ 6.)

### *Ms. Danzig's Role at Bio-Care*

The parties agree upon the general contours of Ms. Danzig's employment, but they dispute the nature and substance of her duties. Defendants state that they hired Ms. Danzig to run Bio-Care's hearing conservation program. (Defs.' Br. in Supp. of Mot. for Summ. J., docket # 31, at 3.) Ms. Danzig states that throughout employment with Defendants, her job title was "audio tech," or "audio medical tech," suggesting a lesser degree of responsibility than Defendants posit. (Danzig dep. at 148.) Mr. Prew, as president and head of operations, and Ryan Rivard, as general manager, were Ms. Danzig's supervisors. (Danzig dep. at 42.) Generally, Mr. Prew engaged clients and managed relationships with them, and Mr. Rivard handled logistical arrangements, including maintaining a master schedule of appointments and creating critical path charts for Ms. Danzig and other employees to follow during appointments. (*Id.* at 140.) Bio-Care provided the equipment Ms. Danzig needed to do her job, which she performed primarily through a mobile testing vehicle kept at a storage unit when not on the road, and at her home office. (*Id.*, 148-49.) Ms. Danzig and Mr.

Rivard typically worked together to finalize her schedule. (*Id.* at 140.) Ms. Danzig and Mr. Rivard corresponded by e-mail about her schedule and appointments routinely. (Pl.'s Ex. G, electronic correspondence from November 2006 – November 2008.)

According to Ms. Danzig, her primary duties included driving the mobile testing unit to client sites; setting up the testing equipment; verifying that the testing equipment was working; distributing paperwork; entering data; presenting videos on audio safety; providing headsets to those being tested; and conducting the testing. (Danzig dep. at 108.) The record does not establish clearly what was involved in conducting the testing. Ms. Danzig indicates that a computer analyzed the testing data. (*Id.* at 117.) Ms. Danzig states that after testing was complete, she would download the data to Bio-Care, and another employee would distribute the data to the clients. (Pl.'s Resp. to Defs.' Mot. for Summ. J. and Cross Mot. for Partial Summ. J., docket # 34, at 4.) The parties dispute the extent to which Ms. Danzig was involved in training customer employees, scheduling jobs and appointments with customers, booking and selling repeat business, and attempting to secure new business. (*See* Defs.' Br. in Support of Mot. for Summ. J. at 5.) Ms. Danzig states that she did not have any supervisory responsibilities in her job. (Danzig dep. at 119.) Ms. Danzig acknowledges that she was the only Bio-Tech employee in its hearing conservation division and that she typically handled the on-site testing by herself. (*Id.* at 39, 67-68.) Ms. Danzig had access to a company credit card and company gas card. (*Id.* at 47-48.) The company paid for her cell phone. The parties dispute the extent to which Ms. Danzig had authority to elect whether to stay overnight when traveling to or from a client. There is no dispute that Ms. Danzig was entrusted with valuable equipment, particularly the mobile testing unit.

*Ms. Danzig's Job Performance*

Defendants state that beginning in 2007, Ms. Danzig's job performance began to decline. (Defs. Br. in Support of Mot. for Summ. J., docket # 31, at 7.) They mention that revenues in her area declined in approximately 2007-2008, while revenues in other areas increased. (*Id.* at 14.) Defendants note customer complaints about her professionalism and punctuality, which the record supports. (*Id.* at 7-8.; *see also* Pl.'s Ex. F, index of electronic correspondence.) Defendants mention that Ms. Danzig cost them clients, but the record does not conclusively support this claim.[6]

In August, 2007, Ms. Danzig requested a raise. (Pl.'s Ex. G, BC0081.) Initially, Mr. Prew determined to give her half the amount she requested, because he had concerns about her job performance. (*Id.*, BC0081, 0085.) Outlining such concerns in an internal e-mail, he noted that her "track record is spotty." (*Id.*, BC0081.) By e-mail of September 14, 2007, he explained to Ms. Danzig that the company would review her job performance in approximately six months, focusing on her punctuality, equipment maintenance, driving record, and client survey comments regarding her performance. (*Id.,* BC0085.) He added that after the review the company would determine any additional salary increase. (*Id.*) Mr. Prew sent Ms. Danzig another e-mail a few minutes later, noting that he had just spoken with a client contact who had complained of Ms. Danzig's tardiness and the cleanliness of the headsets used for testing. (*Id.* at BC0083.) Ms. Danzig responded the next day with a lengthy e-mail expressing anger and frustration. (*Id.* at BC0084.) The e-mail concluded,

> I GUESS IF I CANNOT PLEASE YOU AND AM NOT WORTH THE SALARY INCREASE I ASKED FOR WITHOUT BEING 'RE-EVALUATED' ONCE AGAIN THEN MAYBE I AM NOT THE ONE FOR THIS JOB AT ALL. . . all I can say is if I am not worth the money and I don't do a good job then just fire me."

---

[6] Defendants claim, for example, that Ms. Danzig caused them to lose the Little River Casino as a client after she cancelled an appointment with them, but other staff had worked with the Little River Casino in the past, and it is not clear from the record that Ms. Danzig caused the loss of the client (or even that the client has been lost). In any event, Defendants affirmatively testify to their belief that Ms. Danzig cost them the casino's business. That belief is certainly supported and reasonable on this record, and Ms. Danzig has not come forward with any evidence undercutting the reasonableness of Defendants' belief.

(*Id.*) (emphasis in original). Ms. Danzig sent the e-mail on a Saturday. The following Monday, Mr. Prew sent Ms. Danzig a brief e-mail stating "[w]e will move on to the full raise at this time" (*Id.* at BC0086.) The e-mail does not mention a future review. (*See id.*)

*Ms. Danzig Requests a Lighter Schedule*

In March 2008, Ms. Danzig alerted Messrs. Prew and Rivard via e-mail that her doctor had advised her to try to limit her working hours to forty per week. (*Id.* at BC 333.) In late September, Ms. Danzig sent another e-mail, marked "confidential," to Messrs. Prew and Rivard stating "Well. I have been trying to ignore it but I am getting 'slightly older' -- thus confirmed by my doctor. I have some health issues that just are not gettin' a whole lot better...so I have been told I cannot work more than 8 hours a day now." (*Id.* at BC 63.) She requested that they find someone to share her work responsibilities, and she offered to train that person. (*Id.*) She concludes,

> I think I have just over the years tried to be a one man show and it has caught up with me. Hopefully meds will take hold -- trial and error -- and I will be my 'younger self again' but now looks like this has to be the program. I plan to work 'almost forever' but I have to be healthy to do that unless you fire me before 'forever.'

(*Id.*) Neither Mr. Prew nor Mr. Rivard responded immediately. Ms. Danzig sent a second e-mail on October 2, to which Mr. Prew responded the next day. (*Id.* at 483.) Mr. Prew advised,

> I have a new person into my office today, he will be working with you maybe some times next week and is set up for Audio. . . training on October 21-23. I will look at the calendar to see when he can come in and learn the hearing program with you, he will also take care of the hearing unit maintenance and site storage.

(*Id.*) Ms. Danzig thanked him via e-mail, then added, "BUT JUST BECAUSE I'M A 'SENIOR CITIZEN' evidently [sic] now – don't plan to get rid of me." (*Id.*)(emphasis in original).

The new person to whom Mr. Prew referred was Brian Klawiter, a paramedic in his late twenties. (Pl.'s Resp. to Defs.' Mot. for Summ. J. and Cross Mot. for Partial Summ. J., docket # 34,

6

at 7.) Bio-Care hired Mr. Klawiter on September 25, 2009. (Pl.'s Ex. I, Chronology.) Mr. Prew stated in his deposition that Bio-Care hired Mr. Klawiter to administer flu shots. (*Id.* at 57.) According to Ms. Danzig, when she met Mr. Klawiter, he told her that he was a full-time salaried employee with the company. (Danzig dep. at 208.) According to Mr. Prew, Mr. Klawiter was initially hired as an hourly employee and became salaried after Ms. Danzig was terminated. (Prew dep. at 60.)

On November 4, 2008, Ms. Danzig attempted to pay for gas for the mobile testing vehicle and found that the gas card had no funds. (Danzig dep. at 47-49.) Problems with the gas card had arisen repeatedly and created ongoing frustration for Ms. Danzig. (*Id.*) Ms. Danzig sent an angry e-mail to the company accountant, Ms. Ashbrook. (Pl.'s Ex. G, BC 515.) Ms. Ashbrook attempted to wire funds to Ms. Danzig's bank account, but Ms. Danzig's bank sent back a response saying that the customer had declined the funds. (*Id.* at BC 96.) According to Ms. Danzig, she did not decline the funds. (Danzig dep. at 175-76; Pl.'s Ex. G, BC 458.) Ms. Ashbrook wrote a memorandum summarizing the incident and concluding that Ms. Danzig "at times is not a team player." (Pl.'s Ex. G, BC 96.)

During 2008, Ms. Danzig on several occasions for various reasons cancelled customer appointments on short notice. She cancelled appointments less than 24 hours before they were scheduled to take place on January 30; February 14; April 8; September 16; and November 7, 2008. (Pl.'s Ex. F.) The November 7 cancellation appears to have been a last straw. Bio-Care terminated Ms. Danzig's employment on November 13, 2008. (Compl., docket # 1, ¶ 31.)

Ms. Danzig filed this lawsuit on June 3, 2009. Defendants move for summary judgment on both counts, and Ms. Danzig moves for summary judgment on the FLSA violation she alleges.

7

**Legal Standard**

Summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003) (citing FED. R. CIV. P. 56©). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court views the evidence and draws all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). But that does not mean that any amount of evidence, no matter how small, will save a nonmoving party from losing on a motion for summary judgment. *Scott v. Harris*, 550 U.S. Ct. 372, 380 (2007).

**Discussion**

*1. FLSA Claim*

The FLSA generally requires employers to pay employees no less than time and a half for hours over forty worked in a workweek. 29 U.S.C. §207(1). However, the statute exempts from the overtime pay requirement any "employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. §213(a)(1). The key legal determination regarding Ms. Danzig's FLSA claim is whether she was an exempt administrative employee.

For the administrative exemption to apply, an employee must (1) be compensated on a salary fee basis of not less than $455 per week; (2) have as his or her primary duty "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) have his or her "primary duty include[] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. §

541.200(a)(1)-(3). There is no dispute that Ms. Danzig's employment satisfies the first two elements of the administrative exemption. The parties disagree, however, about whether Ms. Danzig's employment satisfies the third element.

Applicable regulations provide that

> [t]he phrase 'discretion and independent judgment' must be applied in light of all the facts involved in the particular employment situation in which the question arises. Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significant include, but are not limited to: whether the employee has authority to formulate, affect, interpret or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances. . . .
>
> An employee does not exercise discretion and independent judgment with respect to matters of significance merely because the employer will experience financial losses if the employee fails to perform the job properly.

29 C.F.R. § 541.202(b), (f).

Material fact questions exist concerning the extent of Ms. Danzig's responsibility and autonomy. In Ms. Danzig's account, supported by both her deposition and e-mail correspondence, she had very little ability to exercise discretion and independent judgment. According to Ms. Danzig, she worked as a technician and went where Mr. Rivard and Mr. Prew instructed on a schedule they prescribed. Ms. Danzig asserts that she conducted testing not by using independent

9

judgment, but by following critical path steps Mr. Rivard provided. In Ms. Danzig's account, she did not analyze testing data, but simply collected and forwarded it. Ms. Danzig emphasizes that driving and equipment maintenance comprised much of her work. Though Ms. Danzig became salaried in 2005, there is no evidence that her duties changed along with the form of her compensation. That Bio-Care viewed her position as a non-exempt, hourly position initially and did not alter her responsibilities when she became salaried also undercuts Bio-Care's assertion of the administrative exemption. On the other hand, the record also supports Defendants' claim that the exemption applies. Ms. Danzig did perform work that affected business operations to a substantial degree. Indeed, she was the only employee in the hearing conservation area. In Defendants' account, supported primarily by depositions from Messrs. Prew and Rivard, Ms. Danzig was responsible for a division of the company, managed her own schedule, was entrusted with valuable equipment, had access to company credit cards, and was not supervised while performing tests on-site.

The record does not resolve conclusively the degree of discretion and independent judgment afforded to Ms. Danzig in her work. Genuine issues of material fact exist. A portion of Defendants' argument, both in the briefing and at oral argument, suggests that the Court is obligated to decide the applicability of the administrative exemption as a matter of law. The Court does not believe it is possible or proper to do so when the applicability of the exception hinges on facts that are in genuine dispute. In such a case, the fact-finder -- a jury in this case -- must resolve the disputed issues of fact under legal instruction from the Court. There are well-established jury instructions that apply to such determinations, further undercutting the argument that the Court must decide the question as a matter of law even in the face of disputed factual issues. *See* 3C Kevin F. O'Malley,

Jay E. Grenig & William C. Lee, *Federal Jury Practice and Instructions*, §175.20. (5th ed. 2001). Therefore, summary judgment regarding FLSA liability is not appropriate.

Ms. Danzig seeks both liquidated damages under 29 U.S.C. § 260 and the extension of the statute of limitations available under 29 U.S.C. § 255(a) for willful violations of the FLSA. "[T]he court may, in its sound discretion, award no liquidated damages" if an employer demonstrates that its classification of an employee as exempt under the FLSA was made in good faith and upon reasonable grounds. 29 U.S.C. § 260. "What constitutes good faith on the part of an employer and whether he had reasonable grounds. . . are mixed questions of fact and law." 29 C.F.R. § 790.22©. To prove that it acted in good faith, an employer "must show that [it] took affirmative steps to ascertain the Act's requirements." *Martin v. Ind. Mich. Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004). Where a plaintiff demonstrates a willful violation of the FLSA, the statute of limitations is extended to three years. 29 U.S.C. § 255(a). To show a willful FLSA violation, a plaintiff must demonstrate "that the employer either knew or showed reckless disregard for. . .whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). On this record, a jury's resolution of genuine issues of material fact will impact both the good faith and the willfulness inquiries. Accordingly, the Court denies both parties summary judgment on these issues. The entire FLSA set of issues will go to the jury.

2.  *Age Discrimination Claim*

Michigan's Elliot Larson Civil Rights Act, MICH. COMP. L. ANN. § 37.2201, *et seq.*, prohibits employers from, among other things, discharging an individual because of age. MICH. COMP. L. ANN. § 37.2202(a). There is no direct evidence of age discrimination in this case. In the absence of direct evidence that an employer terminated an employee because of age, Michigan courts apply

the *McDonnell Douglas* burden-shifting framework. *Town v. Michigan Bell Telephone Co.*, 455 Mich. 688, 695 (1997). To establish a *prima facie* case of age discrimination, Ms. Danzig must prove by a preponderance of the evidence that (1) she was a member of the protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; (4) she was replaced by a younger person. *Lytle v. Malady*, 458 Mich. 153, 177 (1998). If an employee establishes a *prima facie* case, then the employer must produce evidence of a legitimate non-discriminatory reason for the discharge. *Town*, 455 Mich. at 695-96. If the employer meets this burden, then the employee must come forward with evidence "sufficient to permit a reasonable fact-finder to conclude that the discrimination was the defendant's true motive in making the adverse employment decision." *Id.* That is, the employee "must show by a preponderance of the evidence 'either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [her] discharge, or (3) that they were insufficient to motivate discharge.'" *Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007)(quoting *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)(*overruled on other grounds* by *Geiger v. Tower Automotive*, 579 F.3d 614, 621 (6th Cir. 2009))).

There is no dispute that Ms. Danzig has established the first two elements of the *prima facie* case. Defendants assert that Ms. Danzig has not established the third element of the *prima facie* case. They argue that she was not qualified for her job, because she was not performing the job at a level that met Bio-Care's reasonable expectations. The record reflects, however, that Ms. Danzig had training and experience that qualified her to perform her job, and that she actually performed the job for close to seven years. If deterioration in job performance, as claimed by Defendants, is enough to undermine the *prima facie* case, the *McDonnell Douglas* framework collapses on itself

without ever really considering whether the claim of deteriorating job performance is supported by the record and non-pretextual. Accordingly, in a case like this, where the plaintiff plainly had the necessary qualifications for the job at one point and actually performed the job successfully for a number of years, the Court finds that the plaintiff establishes the third element of the *prima facie* case, and that the job performance issue is better assessed within the remaining steps of the framework.

Defendants also claim Ms. Danzig has not shown the fourth element of the *prima facie* case. They assert that she was not replaced by a younger person, because Mr. Klawiter took on her duties in addition to his flu shot responsibilities, and "a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties." *Lytle*, 458 Mich. at 177-78 n. 27. Given the close proximity in time between when Bio-Care hired Mr. Klawiter and began training him to perform hearing testing, it is at the very least plausible that Bio-Care hired Mr. Klawiter to replace Ms. Danzig. Moreover, Mr. Prew himself described Mr. Klawiter as taking on the hearing position full-time, (Prew dep. at 60), and that is what actually happened after Ms. Danzig's discharge. The Court finds that Ms. Danzig has satisfied the fourth element of the *prima facie* case.

Ms. Danzing has established a *prima facie* case, and the burden therefore shifts to Defendants to produce evidence of a legitimate, non-discriminatory reason for her termination. Defendants have done so. They have produced evidence of work performance problems, including multiple customer complaints, a decline in profitability in the hearing conservation division of the company, and unprofessional e-mails. Defendants have thus satisfied their burden under *McDonnell Douglas*.

The burden shifts back to Ms. Danzig to demonstrate that the proffered reasons are pretext for impermissible age discrimination. Ms. Danzig has not made the necessary showing. The record shows that the company's concerns about her job performance were based in fact, did motivate her termination, and were sufficient to motivate discharge. The record is replete with evidence that Ms. Danzig's work performance deteriorated throughout 2007 and that the company was increasingly disappointed in her work performance. Moreover, the record is devoid of evidence that age had anything to do with the termination. Ms. Danzig herself linked claims of declining health to her advancing age, but there is no evidence in the record of anyone at Bio-Care other than Ms. Danzig herself so much as alluding to her age (or to her health, for that matter). Indeed, Defendants hired Ms. Danzig when she was already approximately 55 years old, which further belies the notion that her age concerned them. Ms. Danzig has not shown that the work performance problems to which Defendants point were pretextual. Her claim of age discrimination cannot succeed.

**Conclusion**

For these reasons, neither party is entitled to summary judgment on Ms. Danzig's Count I (FLSA), but Defendants are entitled to summary judgment on Ms. Danzig's Count II (Elliott Larson Employment Discrimination). The Court will enter an appropriate order.

Dated:   August 20, 2010             /s/ Robert J. Jonker
                                     ROBERT J. JONKER
                                     UNITED STATES DISTRICT JUDGE